**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**TIRON WASHINGTON, JR.,**

**Plaintiff,**

**v.** **Case No. 24-cv-1381**

**CO RICHMOND, *et al.*,**

**Defendant.**

---

**ORDER**

---

Plaintiff Tiron Washington, Jr., who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Washington was allowed to proceed on a Fourteenth Amendment failure-to-protect claim. The parties filed cross-motions for summary judgment. (ECF Nos. 91, 103.) For the reasons stated below, the court grants the defendants' motion for summary judgment and denies Washington's motion for summary judgment.

**PRELIMINARY MATTER**

The defendants argue that Washington failed to follow Federal Rule Civil Procedure 56 and Civil Local Rule 56 when responding to their motion for summary judgment, failing to properly dispute their proposed findings of fact. (ECF No. 113 at 2-6.) District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in a light most

favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). The court allowed Washington to file a sur-reply, correcting these deficiencies. As such, Washington's response contains sufficient facts, allowing the court to rule on the defendants' summary judgment motion. Washington also invokes 28 U.S.C. § 1746 in his complaint, which is enough to convert the complaint into an affidavit for the purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). The court will consider the information contained in Washington's submissions where appropriate in deciding the defendants' motion.

## FACTS

At all times relevant, Washington was a pretrial detainee at the Kenosha County Pre-Trial Facility. (ECF No. 93, ¶ 1.) Defendant Richmond was a correctional officer employed by Kenosha County. (*Id.*, ¶ 2.) Kenosha County is a defendant for only for purposes of indemnity under Wis. Stat. § 895.46. (ECF No. 5 at 3-4.)

On May 27, 2023, Richmond was working in the Pre-Trial Facility in Zone 4, which included Washington's housing unit, Block E. (ECF No. 93, ¶ 4.) He was responsible for conducting headcount and lockdown of the prisoners for the night. (*Id.*, ¶ 6.) Lockdown occurs at approximately 9:00 p.m. (*Id.*, ¶ 7) Richmond began turning off lights and closing cell doors using the officer's control panel in Block E at approximately 9:10 p.m. (*Id.*, ¶ 10.) Richmond asserts that the "control panel is a touch screen and the cells are individually locked using that touch screen." (*Id.*, ¶ 11.) At approximately 9:10:35 p.m., Richmond pressed the button to close Washington's

cell door. (*Id.*, ¶ 16.) As it was starting to close, another prisoner, Readus, slipped into Washington's cell, and Readus and Washington began physically fighting each other (*Id.*, ¶¶ 17-18.) Richmond noticed Readus and Washington fighting and radioed in that a prisoner fight was in progress, which was a call for assistance from other correctional officers. (*Id.*, ¶¶ 20-21.)

As Richmond was calling for assistance, he noticed that another prisoner, Parker-Davis, was still in the dayroom and not locked into his cell. (ECF No. 93, ¶ 22.) At 9:10:55 p.m., Richmond ordered Parker-Davis to lock down in his cell, and Parker-Davis complied. (*Id.*, ¶ 23.) Once Parker-Davis was locked into his cell, at approximately 9:11:02 p.m., Richmond ran out of the officer's control area, ran to the door of Block E, unlocked the Block E Door, entered the Block E sallyport area, and then entered the Block E dayroom. (*Id.*, ¶ 24.) By the time Richmond entered the day room, non-defendants Cpl. Dobbs and CO Rasch had already entered Block E in response to the call for assistance. (*Id.*, ¶ 26.) The defendants assert that Dobbs and Rasch arrived at Block E approximately 30-35 seconds after Richmond called for assistance. (*Id.*, ¶ 27.)

When Rasch arrived at Washington's cell, Readus was on the floor and Washington was standing over him, punching him. (ECF No. 93, ¶ 28.) By the time Richmond arrived at Washington's cell, Washington and Readus were already separated, with Washington standing in the back of his cell. (*Id.*, ¶¶ 29-30.) Both Washington and Readus made moves towards each other, but the officers present threatened to spray them with pepper spray if they continued to fight. (*Id.*, ¶ 32.)

Readus was removed from Washington's cell and put back in his cell until the officers could get him restrained to escort him off the cell block to segregation. (*Id.*, ¶ 34.) Several minutes later, Dobbs, Rasch, Richmond, and CO Bosas escorted Washington to the hallway outside of Block E, pat searched him and properly restrained him to escort him to segregation. (*Id.*, ¶ 37.) At that time, Washington was asked if he wanted to see medical personnel, but he refused. (*Id.*, ¶ 38.)

Washington does not dispute most of the events of the evening of May 27, 2023. He states that the control panel to close the cell doors was not a touch screen but a manual push button. (ECF No. 104, ¶¶ 7-9.) According to Washington, the cell doors close only once an officer turns towards the control panel to push the controls. (*Id.*, ¶ 9.) Washington notes that this detail is important because after Readus entered his cell, the door to Washington's cell, which had been in the process of closing, started to reopen, and remained open for 13 seconds before closing again, locking Readus in the cell with Washington. (*Id.*, ¶ 13.) Washington asserts that when Richmond noticed that Parker-Davis was still in the day room, he deliberately closed both Parker-Davis's cell door and Washington's cell door at the same time. (*Id.*) Washington then asserts that Richmond began to leave the control room but realized he did not open the sallyport door, so he turned back to the control room to open the sallyport door. (*Id.*, ¶ 14.) At that time, he could have reopened Washington's cell door, but he did not. (*Id.*)

Washington also disputes that Readus had stopped fighting him when the officers showed up. (ECF No. 104, ¶ 19.) Washington states that once he stopped

defending himself, "Readus spits blood and saliva in [his] face." (*Id.*) Readus also continued to be hostile towards Washington as the officers were escorting him to segregation. (*Id.*, ¶¶ 20-24.)

Richmond acknowledges that after Washington's cell door had started to close, it began reopening. (ECF No. 93, ¶ 41.) Richmond is unsure why the door reopened and hypothesizes that perhaps the door began reopening on its own when Readus entered the cell or perhaps Richmond "accidentally touched the panel when trying to close the doors" to Parker-Davis's cell. (*Id.*) Richmond notes that during the 13-second period, neither Readus nor Washington attempted to leave the cell. (*Id.*, ¶ 42.)

The defendants assert that it "would have been unsafe and against procedure and training to allow Inmate Washington and Inmate Readus back into the dayroom to possibly continue and escalate their fight." (ECF No. 93, ¶ 44.) It was also necessary to get Parker-Davis safely back in his cell before responding to the fight between Washington and Readus. (*Id.*, ¶ 46.) In short, the defendants assert that Richmond "followed proper procedure by not opening the cell door to allow Inmate Washington and Inmate Readus in the day room." (*Id.*, ¶ 51.)

Washington states that as a result of the fight, he lost blood and knew he was hurt but refused medical attention "due to adrenaline going." (ECF No. 104., ¶ 27.) He asserts that he incurred an injury to his "ulnar nerve" in his right arm as a result of the fight. (*Id.*) Washington submits as evidence a sick call request that he sent in on June 11, 2023, stating "was attacked by a inmate 5/27/23, felt pain in my right elbow, asked to see a medical doctor the next day in the hole & never got assistance.

I ended up tryin [*sic*] to let it heal on my own & move it, pushups, & rotate it, but I can't do any regular range of motion without feeling pain. I think its fractured, the pain interrupts my sleep when I move & wakes me up out my sleep." (ECF No. 104-1 at 9.) Washington wrote health services again on June 28, 2023, complaining about pain and numbness in his right elbow that he believes was a result of his fight with Readus. (*Id.* at 12.) A nurse responded, "you were seen by the provider today. According to her findings there are no needs for special accommodations or further testing." (*Id.*) Washington wrote for health services about his elbow several more times between July 2023 and January 2024, noting that he is not able to do pushups and that when he moves it, it is numb. (*Id.*, at 13-16.) Washington provides additional medical records showing that he was treated for chronic elbow pain, including over the counter medication and physical therapy. (*Id.* at 17-66.)

There are several videos of the incident provided by both Washington and the defendants. There is a surveillance video of Block E; two body camera videos from Richmond's camera; and body camera videos from Rasch and Bosas. (ECF Nos. 101, 108.) The following observations can be made from these videos. It is impossible to tell whether the control panel was a touch screen or manual, but it is clear that Richmond goes from routinely shutting off lights and closing cell doors in Block E to responding to the fight, in a somewhat chaotic manner. Readus appears to quickly slip into Washington's cell and they both vigorously fight each other for less than a minute. Once Dobbs and Rasch arrive at the scene, Washington and Readus separate. It is unclear if Readus spits at Washington. The door does open for 13 seconds

immediately after Readus enters the cell, and it begins to close again immediately after Richmond orders Parker-Davis to return to his cell. Readus continues to be verbally hostile towards Washington after he is removed from Washington's cell. The whole encounter lasts approximately a minute.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for

trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Washington claims that Richmond violated his constitutional rights when he failed to protect him from Readus. "Pretrial detainees have a right to be free from physical harm inflicted by others in the institution." *Davis v. Rook*, 107 F.4th 777, 780 (7th Cir. 2024). The Fourteenth Amendment's Due Process Clause "prohibits any punishment meted out 'prior to an adjudication of guilt in accordance with the due process of law.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). To demonstrate that an officer violated his Due Process rights, a plaintiff "must prove only that a reasonable officer under the circumstances would have appreciated the risk of harm to the detainee, and from there, that the defendant acted in an objectively unreasonable way in addressing that risk." *Id.* Thus, a plaintiff is not required "to prove the defendant's subjective awareness of the risk of harm to establish liability." *Id.* "In the context of an assault by another detainee, an officer's actions will typically be unreasonable only if the officer had notice of a substantial risk of injury." *Thompson v. Perry*, No. 24-1385, 2025 WL 1693518 at *2 (7th Cir. June 17, 2025) (citing *Thomas v. Dart*, 39 F.4th 835, 841-42 (7th Cir. 2022)). This is because "a reasonable officer in the defendant's shoes would have 'put the puzzle pieces together' about the risk of harm", so a plaintiff "must show that the defendant actually received

"all the information about a potential health or safety risk." *Davis*, 107 F.4th at 780-81 (quoting *Kemp v. Fulton Cnty.,* 27 F.4th 491, 494-95 (7th Cir.2022)).

Washington first argues that Richmond should have known that Readus presented a substantial risk to his health or safety because Richmond knew that Readus was charged with violent crimes including murder. (ECF No. 104, ¶ 11.) That's not enough. Prisons and jails are often full of violent offenders; guards cannot be charged with prescience as to which ones will try to injure other inmates. *See Thompson*, 2025 WL 1693518 at *2 (determining that the defendant officers did not act with objective unreasonableness where another detainee made a threat against the plaintiff, but the plaintiff failed to provide evidence that the defendant officers knew of the detainee's threat). Washington does not present any evidence that Richmond knew that Readus was going to initiate a fight prior to the fight actually occurring.

Washington also argues that because Richmond opened the cell for 13 seconds and then closed it again, he intentionally chose to keep Washington in a substantially risky situation. While at this point, Richmond was aware that Readus was attacking Washington, obviously a risky situation, Washington does not demonstrate that the cell door opening and then closing was intentional or even reckless. As the video shows, Richmond, upon noticing that Parker-Davis was out of his cell, had to quickly react to ensure Parker-Davis's safety. Given what the video shows, including the chaotic and urgent response by Richmond, at best, Richmond activating the door was, at most, a negligent action. Coupled with the fact that the whole incident lasted a

little over a minute, and the limited nature of the plaintiff's injuries, no reasonable factfinder could conclude that Richmond intentionally or even recklessly manipulated Washington's cell door to keep Washington within a dangerous situation. Summary judgment is granted in the defendants' favor.

## CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment and denies Washington's motion for summary judgment. The defendants also argued that they were entitled to qualified immunity but because the court decided the case in their favor on the merits, it does not have to address that argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 91) is **GRANTED**.

**IT IS FURTHER ORDERED** that Washington's motion for summary judgment (ECF No. 103) is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely

requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 19th day of November, 2026.

Stephen C. Dries

STEPHEN DRIES
United States Magistrate Judge